# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**REBECCA MOORE,**

        **Plaintiff,**

v.                                                             Civil Action 2:20-cv-5114
                                                            Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF**
**SOCIAL SECURITY,**

        **Defendant.**

## OPINION AND ORDER

Plaintiff, Rebecca Moore, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The parties in this matter consented to the Undersigned pursuant to 28 U.S.C. § 636(c). (Docs. 8, 9). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff filed her applications for DIB and SSI on May 23, 2017, alleging that she was disabled beginning March 29, 2017. (Tr. 216–227). After her applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on August 16, 2019. (Tr. 36–61). The ALJ denied benefits in a written decision on December 3, 2019. (Tr. 7–35). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on September 29, 2020 (Doc. 1), and the Commissioner filed the administrative record on April 15,

2021 (Doc. 18).  Plaintiff filed her Statement of Errors (Doc. 23) on July 21, 2021, and Defendant filed an Opposition (Doc. 25) on September 1, 2021.  Plaintiff filed her Reply (Doc. 26) on September 13, 2021.  Thus, this matter is now ripe for consideration.

### A. Relevant Hearing Testimony

The ALJ summarized the reports presented to the administration and testimony from Plaintiff's hearing:

> [Plaintiff] alleged she was disabled due to rheumatoid arthritis, hypothyroidism, gastroesophageal reflux disease, and acid reflux. (Exhibit 2E). She reported having taken a variety of medications, including iron, Levothyroxine, omeprazole, Tramadol, Mobic, and Prednisone. (Exhibits 2E, 4E, 7E, 9E). She indicated some of her medications caused weight gain, upset stomach, diarrhea, and headaches. (Exhibits 4E, 9E). She reported having a cane prescribed to help with the pressure of her knee. She claimed she used her cane every time she got up to walk. (Hearing testimony).
>
> [Plaintiff] reported a variety of symptoms. She reported having a lot of pain and swelling from her rheumatoid arthritis. She reported her feet were swollen and hurt all the time. She reported her feet were disfigured and she could not wear any shoes other than house slippers. She claimed to have pain all the time. (Exhibit 4E). She reported having swelling and pain in her hands, feet, knees, elbows, and shoulders. She testified she had rheumatoid flares every two weeks to once every month. Her medication would relieve the flares and would sometimes take two to three days to resolve. (Hearing testimony). She indicated she had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, concentrating, and using her hands. She indicated she could only walk twenty to thirty feet at a time and needed to rest for fifteen to thirty minutes before she could start walking again. (Exhibit 4E). She reported having difficulty holding things or writing, though she was able to fill out some disability paperwork by hand. (Exhibit 9E). She testified she could lift a gallon of milk some days, but not others. She reported difficulty opening a bottle of water. She claimed she could not type. She would climb the four stairs to get into her apartment one step at a time. (Hearing testimony). She indicated she could pay attention for one to two hours at a time. She could follow written and spoken instructions well. She got along with authority figures. (Exhibit 4E). She reported having issues concentration and completing tasks, but only when she was in pain. She denied having any psychological issues. (Exhibit 1A).
>
> As for [Plaintiff]'s day-to-day activities, she lives with her adult son. (Hearing testimony). She reported every day varied as some days she could barely walk and other days she could stand long enough to wash a few dishes. (Exhibit 4E). She

>  testified it was hard to get out of bed in the morning. (Hearing testimony). She reported doing some household chores, but a different amount daily depending on how much she could stand. She would try to do some chores every day. (Exhibit 4E). Later, she claimed to do no chores. (Hearing testimony). She reported she could not sleep at all if the pain was bad that night. She reported having a hard time using buttons on her jeans. She reported she had limited ability to stand in the shower. She indicated it was hard to hold a hairbrush or razor without dropping them. She did not need reminders to take care of her personal care or take her medications. She would make a sandwich daily. She would go outside daily. She could drive and go out alone. (Exhibit 4E). She later testified she hardly ever drove as she did not have a vehicle. (Hearing testimony). She could shop in stores and manage her own money. She would spend time watching television. She would talk with others daily. She indicated she could not get out a lot anymore. (Exhibit 4E).

(Tr. 16–17).

### B. Relevant Medical Evidence:

The ALJ summarized the medical records as to Plaintiff's impairments:

> In February 2017, it was noted her pain was typically controlled with an occasional Ultram. She presented to the hospital with a recent exacerbation of her symptoms. (Exhibit 4F, page 7).
>
> Since the alleged onset date, in July 2017, she wanted her primary care provider to write a letter regarding her recent disability application. However, her doctor noted he needed more specifics about what the letter should contain. (Exhibit 10F, page 4). She indicated she could not wear shoes because her feet hurt too much. She reported her rheumatoid arthritis had been worse in the past year with symptoms in her knees, back, and hands. (Exhibit 10F, page 5).
>
> In August 2017, she went to a rheumatologist for her rheumatoid arthritis. [Plaintiff] was ambulatory and walked without restrictions. She reported occasionally exercising and that she could care for herself. She reported five out of ten generalized pain. She reported having arthritic symptoms since her late twenties. She reported having some varying morning stiffness. (Exhibit 9F, page 2). She reported it hurt all over. (Exhibit 9F, page 3). She had reportedly been diagnosed with rheumatoid arthritis after seeing a rheumatologist twenty-four years ago. She only briefly saw this rheumatologist and had not followed up with them. She had not been seen by a rheumatologist since. She was instead being given steroid and pain medications by her primary care provider during flare-ups. She reported pain and swelling in her hands, knees, feet, and ankles. She reported some numbness and tingling, but denied having any weakness or difficulty walking. (Exhibit 9F, page 3).

3

In September 2017, she reported having a rheumatoid flare-up since the day before. (Exhibit 11F, page 1). She reported generalized pain similar to prior flare-ups. She described her flares as intermittent and that they usually responded to Prednisone and Percocet. She denied any significant redness or swelling about any major joints. She indicated that weather changes are what normally triggered her pain [crisis]. (Exhibit 11F, page 5).

In February 2018, she came in for her first follow-up with a rheumatologist since August 2017, having missed a prior appointment. She had not gotten ordered X-rays done. She was to get labs and X-rays done prior to starting methotrexate therapy. (Exhibit 19F, page 122). She reported her diffuse joint pain was a six out of ten and noted it varied. She reported having variable morning stiffness. She denied having any numbness or weakness. (Exhibit 19F, page 118).

In April 2018, she reported having typical a rheumatoid flare with pain in her ankles, wrists, and left shoulder. She was looking to get a new rheumatologist as she was having some disagreements as to her treatment. (Exhibit 19F, page 116). It was noted she would take a short dosage of a steroid for her flares and this had worked well for her in the past. She would take Percocet occasionally when her pain was severe. (Exhibit 19F, page 117).

In September 2018, she reported having no joint pain. (Exhibit 19F, page 3). In October 2018, she reported she was alternating between ibuprofen and Tylenol for her pain. She reported having a typical flare. She reported having pain predominately in the feet, knees, and hips. She reported her last rheumatoid flare had been four months ago and that she usually had three to four flares a year. (Exhibit 19F, page 92).

In December 2018, she reported having a flare with increased pain in her hands, elbows, ankles, and knees that was typical for her flares. At the time, she was not on any rheumatoid arthritis medications. (Exhibit 19F, page 68). She was again given short term prescriptions for a steroid and a narcotic. (Exhibit 19F, page 69).

In January 2019, she reported having a rheumatoid flare with pain and swelling in her right knee for a day. She reported these flares sometimes happened when it was cold outside. She reported she was having them more frequently as she was in the process of changing her rheumatologist, as she wanted a second opinion about chemotherapy. She was not on any medication for her rheumatoid arthritis, typically just getting short course of Prednisone and Percocet during flares. (Exhibit 19F, page 65).

In April 2019, she reported she had been taking Tramadol for several years for her rheumatoid arthritis, but had then stopped. She indicated that in 2017 she had been started on Prednisone. She reported that between 2017 to April 2019, she had been seen in the emergency room several times and given short courses of opioids and Prednisone, which usually improved her flares significantly for months at a time.

Her last visit with a flare had been January 27, 2019 and her last one before that had reportedly been October 14, 2018, though records had shown one in December 2018. She had not had a flare since January. However, she reported she was experiencing more progressive, chronic pain. She reported pain and swelling in her hips, elbows, feet, fingers, and knees. She indicated her symptoms were worst in the morning with two to four hours of morning stiffness, but sometimes lasted all day. She reported her feet were usually the most painful and were at times swollen to the point she could not wear shoes. She took ibuprofen daily, which mildly helped the swelling, but not the pain. She also took hot showers, which provided some short[-]term relief. (Exhibit 17F, pages 2-3). Examination showed mild upper and lower extremity deformities suggestive of rheumatoid arthritis. (Exhibit 17F, page 7).

In May 2019, it was noted her last flare requiring treatment had been a few months prior. (Exhibit 16F, page 2). Later that month, she reported having a flare for the past two days that was a typical rheumatoid flare. She reported having approximately three to four flares a year. She was concerned because they seemed to be occurring more frequently. She was not on any rheumatology medication other than for flares. She reported pain in almost all her joints, including her shoulders, elbows, wrists, knees, ankles, and feet. She reported some mild swelling in her knees. (Exhibit 19F, page 26). She ambulated without difficulty or assistance. She was given a short course of Prednisone and narcotics. (Exhibit 19F, page 28).

In June 2019, she went to the emergency room with some complaints of two episodes of chest pain. Her chest pain resolved with antacids. She also reported some neck pain that morning after waking up. Her neck pain radiated into the back of her head and had worsened during the day. This was atypical of her rheumatoid arthritis, as she had not experienced neck pain from it in the past. She denied having any tingling or weakness. She reported her rheumatoid flares were more frequent and intense. (Exhibit 19F, page 20). Her chest pain was believed to be from acid reflux and her neck pain was attributed to her arthritis. She was given a short dosage of Percocet and Prednisone. (Exhibit 19F, page 22).

In July 2019, [Plaintiff] was seen by her primary care provider. She wanted a prescription for a cane. (Exhibit 20F, page 3). She was noted to be ambulatory and walking without restrictions. (Exhibit 20F, page 4). She ambulated normally on examination. She reported having no joint pain. Despite this, her primary care provider went ahead and prescribed her a cane. (Exhibit 20F, page 5). Later that month, she went to the emergency room with a flare for the past two or three days. Her pain was mostly in her ankles, knees, fingers, wrists, and elbows. She had minimal swelling. She was still not on any rheumatology medication and had not been for years. (Exhibit 22F, page 6). She was ambulatory during the hospital exam and there was no mention of her use of a cane. She was again given a short dose of Prednisone and Percocet. (Exhibit 22F, page 9).

On examination, she had typical rheumatoid deformities in her hands and feet. (Exhibit 9F, page 4; Exhibit 17F, page 6; Exhibit 19F, page 120). She had some synovitis. (Exhibit 9F, page 4). At times, her extremities had no deformities. (Exhibit 19F, pages 67, 74, 93, 117). Her back had a normal curvature. (Exhibit 10F, page 6). She had tender points and tenderness. (Exhibit 9F, page 4; Exhibit 10F, page 6; Exhibit 19F, pages 21, 28, 69, 93, 117, 120; Exhibit 22F, page 9). At times, she had no tenderness. (Exhibit 16F, page 4; Exhibit 19F, page 67). She sometimes had limited range of motion. (Exhibit 9F, page 4; Exhibit 19F, page 120). At times, her range of motion was intact. (Exhibit 19F, pages 21, 28, 67, 69, 74, 93, 117; Exhibit 22F, page 9). Her sensation was intact. (Exhibit 9F, page 4; Exhibit 10F, page 6; Exhibit 19F, pages 28, 93, 120). She sometimes had normal strength. (Exhibit 9F, page 4; Exhibit 19F, pages 28, 93). At times, her strength was reduced. (Exhibit 10F, page 6). She had normal muscle tone. (Exhibit 9F, page 4; Exhibit 10F, page 6). Her reflexes were intact. (Exhibit 10F, page 6). She sometimes had some limited ambulation. (Exhibit 9F, page 3; Exhibit 19F, page 120). Typically, she ambulated normally. (Exhibit 10F, pages 3, 5; Exhibit 19F, page 3; Exhibit 20F, page 5; Exhibit 22F, pages 9, 14-15, 43, 86). Her gait was sometimes normal. (Exhibit 9F, page 4; Exhibit 10F, page 6; Exhibit 19F, pages 93, 120). At times, her gait was slow, but steady. (Exhibit 19F, page 94). She had normal coordination with no tremor. (Exhibit 9F, page 4; Exhibit 19F, page 120). She sometimes had no edema. (Exhibit 9F, page 4; Exhibit 10F, page 6; Exhibit 16F, page 4; Exhibit 19F, page 93; Exhibit 22F, page 9). At times, she had mild edema at the knee. (Exhibit 19F, page 67). She sometimes had diffuse swelling in her hands, feet, wrists, knees, or left shoulder. (Exhibit 9F, page 4; Exhibit 10F, page 6; Exhibit 19F, pages 28, 93, 117, 120). At times, she had no swelling. (Exhibit 22F, page 9). She had no effusions. (Exhibit 11F, page 5; Exhibit 22F, page 9).

Imaging and testing partially supported [Plaintiff]'s allegations. October 2012 X-rays of her feet showed a chronic dislocation and progressive erosive changes at the fifth MTP joint, consistent with rheumatoid arthritis. These findings had slightly progressed since 2005. (Exhibit 17F, page 3). November 2015 X-rays of the right hand showed intact osseous structures, normal mineralization, and anatomic alignment. There [were] no major soft tissue abnormalities. There were degenerative changes at the first carpometacarpal joint. (Exhibit 19F, page 220). A December 2016 chest X-ray showed mild to moderate spurring in the thoracic spine. (Exhibit 19F, page 283). A September 2017 bone density scan was normal. (Exhibit 12F). June 2019 X-rays of the cervical spine showed some degeneration that may be related to her rheumatoid arthritis. (Exhibit 19F, page 22).

February 2018 X-rays of the ankles and feet showed degenerative and enthesopathic changes. There were advanced changes of inflammatory arthritis involving the fifth MTP joints in both feet. There were also some inflammatory arthritis involving the first MTP joints in both feet as well. (Exhibit 19F, pages 272-273). February 2018 X-rays of the hands and wrists showed multifocal degenerative arthritis in the hands and wrists, but no definitive radiographic findings of inflammatory arthritis. There was mild to moderate joint space narrowing and

6

marginal osteophyte formation in multiple IP joints and the first MCP and CMC joints. (Exhibit 19F, pages 274-275).

(Tr. 17–20).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through December 31, 2021, and has not engaged in substantial gainful activity since March 29, 2017, her alleged onset date of disability. (Tr. 13). The ALJ determined that Plaintiff suffered from the severe impairments of rheumatoid arthritis and inflammatory polyarthropathy. (*Id.*).

The ALJ also considered Plaintiff's fibromyalgia under SSR 12-2p:

> []. In order to find a medically determinable impairment of fibromyalgia, it must be diagnosed by a licensed physician who reviewed [Plaintiff]'s medical history and conducted a physical exam. [Plaintiff] must show a history of widespread pain in all four quadrants and axial skeletal pain for at least three months, excluding other disorders that could cause the symptoms. In addition, [Plaintiff] must show eleven out of eighteen positive tender points on physical examination or repeated manifestation of six or more fibromyalgia symptoms, signs, or cooccurring conditions. There is no objective evidence establishing fibromyalgia. Therefore, the undersigned finds [Plaintiff]'s fibromyalgia to be a non-medically determinable impairment.

(Tr. 14).

Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, meet or medically equal a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> After careful consideration of the entire record [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasionally push and/or pull hand and foot controls; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance and stoop; occasionally kneel and crouch; never crawl; bilateral upper extremity limited to occasional handling and fingering; no exposure to unprotected heights and dangerous machinery; no commercial driving; avoid concentrated exposure to extreme heat, extreme cold, and humidity; absent one day of work a month.

(Tr. 15).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 17).

As to the medical opinion of Dr. Matthew Cook, the ALJ determined,

> The undersigned has considered the opinion of Dr. Matthew Cook. He indicated that [Plaintiff] could only lift two pounds occasionally and two pounds frequently. He indicated she could only stand and/or walk half an hour in an eight-hour day and at a time. He indicated she could only sit for half an hour total in an eight-hour period and at a time. He indicated she could never climb, crouch, balance, kneel, stoop, or crawl. He indicated she could not use her arms or hands for activities such as folding, typing, or sorting for three hours or six hours a day. He indicated on average she would be absent from work more than three times per month. He indicated she would be distracted by her pain or psychological distress on average two thirds of a workday. He indicated she could not do the full range of light or sedentary work. (Exhibit 21F). He had treated [Plaintiff] for many years. However, he was not a rheumatologist. He did not really support his findings with objective evidence. For instance, to explain why she could only stand and/or walk for a half hour total and sit for a half hour total in an eight-hour day, he indicated [Plaintiff]'s "neck, back, and shoulder pain" supported this assessment. These are subjective complaints and alone do not really support such degree of limitations. His significant degree of limitations are not supported by the record. For instance, there is no indication that [Plaintiff] had no ability to balance whatsoever, as such a limitation would preclude any walking at all, which is not supported in the record. At Dr. Cook's most recent examination of [Plaintiff], [Plaintiff] reported having no joint pain and she ambulated normally. Despite that, Dr. Cook gave her a cane because she asked for one to be prescribed. (Exhibit 20F, page 5). His opinion that she could not even perform sedentary work was inconsistent with the fact that the record showed she had rheumatoid arthritis for over twenty-five years and had been working for some time with it. It was also inconsistent with her conservative treatment, as she was not taking medications between flare-ups and was having flare-ups three to four times a year. Even when having a flare, she could ambulate without difficulty or assistance. (Exhibit 19F, page 26). Thus, his opinion is not persuasive.

(Tr. 21–22).

Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff is unable to

perform her past relevant work as a clerical worker, gambling cashier or benefits clerk, but could perform the job duties of other unskilled, light exertional representative occupations such as usher, with 29,500 jobs nationally, a furniture rental clerk with 46,000 jobs nationally, and a fruit distributor, with 35,300 jobs nationally. (Tr. 23–24). She therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act, since March 29, 2017. (Tr. 24).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    DISCUSSION

Plaintiff alleges three assignments of error. First, Plaintiff argues the ALJ erred by declining to find her fibromyalgia as a severe impairment at Step Two. (Doc. 23 at 5). Next,

9

Plaintiff argues the ALJ did not properly weigh the opinion from treating physician, Dr. Matthew Cook, in the RFC analysis. (Doc. 23 at 6–7). Finally, Plaintiff argues the ALJ erred in the evaluation of Plaintiff's symptom severity. (Doc. 23 at 1, 6–8).

### A. Step Two

At step two, the ALJ must consider whether Plaintiff's alleged impairments constitute "medically determinable" impairments. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques[,]" and "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521. Additionally, to be classified as "medically determinable" an impairment must meet the durational requirement, meaning, "it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. "If an alleged impairment is not medically determinable, an ALJ need not consider that impairment in assessing the RFC." *Jones v. Comm'r of Soc. Sec.*, No. 3:15-cv-00428, 2017 WL 540923, at *6 (S.D. Ohio Feb. 10, 2017). At step two of the sequential analysis, Plaintiff has the burden of proving the existence of a medically determinable impairment. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (stating that the burden of proof lies with the claimant at steps one through four of the process and only shifts to the ALJ at step five); *Smith v. Comm'r of Soc. Sec.*, No. 2:20-CV-5473, 2021 WL 3883061, at *3 (S.D. Ohio Aug. 31, 2021) ("At step two of the sequential evaluation process, Plaintiff bears the burden of proving the existence of a severe, medically determinable impairment that meets the twelve-month durational requirement.").

Plaintiff alleges the ALJ failed to find her fibromyalgia a medically determinable impairment at step two. The Sixth Circuit has recognized that fibromyalgia may be a "severe

impairment." *See, e.g.*, *Preston v. Sec'y of Health and Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988). It is, however, an "elusive" and "mysterious" disease without a known cause or cure. *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). Because fibromyalgia is elusive, the Social Security Administration provided additional guidance on the disease in 2012. *See* Soc. Sec. Ruling, SSR 12-2p; Titles II & XVI: Evaluation of Fibromyalgia, SSR 12-2P (S.S.A. July 25, 2012). The purpose of Social Security Ruling ("SSR") 12-2p is to "provide[] guidance on how we develop evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM). . . ." *Id.* at *1. SSR 12-2p states that the Social Security Administration "will find that a person has an MDI of FM if the physician diagnosed FM and provides the evidence we describe in section II.A. or section II.B., and the physician's diagnosis is not inconsistent with the other evidence in the person's case record." *Id.* at *2. Sections II.A. and II.B. include two sets of criteria for diagnosing fibromyalgia: the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia and the 2010 ACR Preliminary Diagnostic Criteria. *Id.* at *2–3. The first set of criteria requires that the claimant demonstrate: (1) a history of widespread pain; (2) at least 11 positive tender points on physical examination and the positive tender points must be found bilaterally, on the left and right sides of the body and both above and below the waist; and (3) evidence that other disorders, which could cause the symptoms or signs were excluded. *Id.* (§ II.A.1.–3. criteria). The second set of criteria requires that the claimant demonstrate: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions; and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded. *Id.* at *3 (§ II.B.1.–3. criteria).

Here, Plaintiff argues that the ALJ committed reversible error by failing to find fibromyalgia a medically determinable impairment. After stating the 12-2p factors, the ALJ found that there was "no objective evidence establishing fibromyalgia." (Tr. 14). The Undersigned concludes that was not error because Plaintiff, at best, has established only two of the three factors needed to establish a fibromyalgia diagnosis. Plaintiff in the Statement of Errors (Doc. 23 at 5) and at the ALJ hearing (Tr. 36–61), did not establish the required SSR 12-2p factors for finding a medically determinable impairment of fibromyalgia. Plaintiff arguably attempted to establish the first factor, a widespread history of pain. And she established factor two in the Statement of Errors by indicating that 18 of 18 tender points were present on exams. (Doc. 23 at 6 (citing Tr. 701, 709, 719, 723, 730, 738–39)). Yet, nowhere in the record has Plaintiff established—or even attempted to establish—the third factor. In order to establish fibromyalgia as a medically determinable impairment, a claimant must satisfy all three requirements, including factor three, evidence that other disorders were excluded. *Smith*, 2021 WL 3883061, at *5 (affirming ALJ's decision because "Plaintiff failed to identify evidence that she meets all the criteria of SSR 12-2p). *See also Kaufmann v. Saul*, No. 3:17-CV-525-DCP, 2019 WL 3782189, at *7 (E.D. Tenn. Aug. 12, 2019) (finding that Plaintiff failed to satisfy SSR 12-2p, in part, because of Plaintiff's failure to establish factor three, exclusion of other disorders); *Truran v. Comm'r of Soc. Sec.*, No. 16-10862, 2017 WL 3613970, at *1 (E.D. Mich. Aug. 23, 2017) (finding that Plaintiff could not satisfy SSR 12-2p criteria because Plaintiff "ha[d] not come forward with evidence of the third criterion—that other disorders that could cause pain, numbness, and fatigue . . . were excluded[]").

Since it is Plaintiff's burden to provide evidence of her impairments, and she failed to put forth evidence to satisfy the criteria of SSR 12-2p, the ALJ did not err in determining that Plaintiff did not have a medically determinable impairment of fibromyalgia. *Smith*, 2021 WL 3883061, at

*5. The ALJ properly determined that fibromyalgia is not a medically determinable impairment, so she is not required to consider fibromyalgia in assessing the RFC. *See Jones*, 2017 WL 540923, at *6.

      **B.**      **Dr. Cook's Opinion**

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id.* Plaintiff filed her application after May 23, 2017, so it is governed by the new regulations describing how evidence is categorized, considered, and articulated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017). The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1] 20 C.F.R. §§ 404.1513(a)(1)–(5); 416.913(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from the claimant's medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§§ 404.1513(a)(2), (5); 416.913(a)(2), (5).

familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5). Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. §§ 404.1520c(b)(2); 416.920c(b)(2). An ALJ may discuss how he or she evaluated the other factors but is not generally required to do so. *Id*. In addition, when a medical source provides multiple opinions, the ALJ need not articulate how he or she evaluated each medical opinion individually. §§ 404.1520c(b)(1); 416.920c(b)(1). Instead, the ALJ must "articulate how [he or she] considered the medical opinions . . . from that medical source together in a single analysis using the factors listed [above], as appropriate." *Id.*

Here, Plaintiff alleges that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to properly weigh the opinion of Dr. Matthew Cook. (Doc. 23 at 6). Plaintiff says that Dr. Cook "support[ed] his opinions with objective findings of hand, finger, and feet deformities due to rheumatoid arthritis." (Doc. 23 at 6 (citing Tr. 896–99).

The ALJ considered the opinion of Dr. Matthew Cook and ultimately found his opinion unpersuasive. (Tr. 21–22). In coming to this conclusion, the ALJ considered Plaintiff's significant treatment history with Dr. Cook but noted that Dr. Cook is not a rheumatologist. (Tr. 21). The ALJ also concluded that Dr. Cook's opined limitations, which were extreme, did not have record support. (*Id.*). For example, the ALJ considered Dr. Cook's opinion that Plaintiff "could only stand and/or walk for a half hour total and sit for a half hour total in an eight-hour day." (*Id.*). But Dr. Cook noted only Plaintiff's "neck, back, and shoulder pain" in support of the limitation. The ALJ identified these as "subjective complaints" that standing "alone do not really support such degree of limitations." (*Id.*). The ALJ noted that "there is no indication that the claimant had no ability to balance whatsoever, as such a limitation would preclude any walking at all, which is not

14

supported in the record." (*Id*.). Additionally, Dr. Cook's opinion that Plaintiff "could not even perform sedentary work was inconsistent with the fact that the record showed she had rheumatoid arthritis for over twenty-five years and had been working for some time with it." (*Id*.). Lastly, the ALJ noted that Dr. Cook's assessment was "inconsistent with her conservative treatment, as she was not taking medications between flare-ups and was having flare-ups three to four times a year." (*Id*.). Through this analysis, the ALJ found that Dr. Cook's opinion is not supported by or consistent with the objective medical evidence or other sources.

In sum, the ALJ considered the required factors, supportability and consistency, and found Dr. Cook's opinion to be unpersuasive. This decision was supported by a lengthy discussion of the medical record (Tr. 15–20), in addition to illustrative examples in the discussion of Dr. Cook's opinion (Tr. 20–21). That is all the regulations require, and there was no error. *See* 20 C.F.R. § 416.920c(b)(2); *Smith v. Comm''r of Soc. Sec.*, No. 2:20-CV-2886, 2021 WL 1996562, at *6 (S.D. Ohio May 19, 2021).

    **C.**    **Symptom Severity**

The Social Security Administration uses a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether an individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. Soc. Sec. R. 16-3p, 2016 WL 1119029, *3 (March 16, 2016). Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which the individual's symptoms limit her ability to perform work-related activities. *Id.* at *4. To do this, the ALJ must examine the entire record, including the objective medical evidence; the individual's relevant statements; statements and other information provided by medical sources and others; and any other relevant evidence in the record. *Id.* The ALJ should also consider:

15

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7; *see also* 20 C.F.R. § 404.1529(c)(3). Importantly, "not every factor will be discussed in every case. If there is no evidence regarding one of the factors, that factor will not be discussed." *Davis v. Comm'r of Soc. Sec. Admin.*, No. 3:19-CV-117, 2020 WL 3026235, at *6 (S.D. Ohio June 5, 2020) (citing Soc. Sec. R. 16-3p, 2017 WL 5180304, *8), report and recommendation adopted sub nom. *Davis v. Comm'r of Soc. Sec.*, No. 3:19-CV-117, 2020 WL 6273393 (S.D. Ohio Oct. 26, 2020).

Here, Plaintiff argues that the ALJ improperly evaluated her symptom severity. (Doc. 23 at 1, 6). Specifically, Plaintiff argues that the ALJ should have considered Plaintiff's "increased chronic / progressive pain." (Doc. 23 at 6 (citing Tr. 635)). Plaintiff further argues that the ALJ should have considered Plaintiff's pain and swelling in her hips, elbows, feet, fingers, and knees. (*Id.* at 7 (citing Tr. 635)).

The ALJ followed the required two step symptom analysis and ultimately concluded Plaintiff had the RFC to perform light work. (Tr. 15). The ALJ determined that Plaintiff had medically determinable impairments that could reasonably be expected to cause her alleged symptoms. (Tr. 17). Then, the ALJ considered the medical evidence, medication effectiveness

16

and side-effects, Plaintiff's symptoms including aggravating factors, and Plaintiff's daily activities. (Tr. 16). The ALJ noted Plaintiff's alleged disabilities: rheumatoid arthritis, hypothyroidism, gastroesophageal reflux disease, and acid reflux. (Tr. 16 (citing Tr. 249–55)). The ALJ considered Plaintiff's medications (iron, Levothyroxine, omeprazole, Tramadol, Mobic, and Prednisone) and the medications' side-effects (weight gain, upset stomach, diarrhea, and headaches). (Tr. 16 (citing Tr. 249–55, 265–272, 277–84, 287–94)). The ALJ made note of Plaintiff's alternative treatment of using a cane. (Tr. 16 (citing 38–61). The ALJ next considered Plaintiff's symptoms including pain and swelling, "difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, concentrating, and using her hands[,]" and only being able to walk twenty to thirty feet at a time. (Tr. 16). Lastly, the ALJ considered Plaintiff's daily activities which Plaintiff reported varied from day to day. (*Id.*).

Although the ALJ acknowledged Plaintiff's medically determinable impairments, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." (Tr. 17). In making the determination, the ALJ considered objective medical evidence and other evidence as described in SSR 16-3p.

Specifically, the ALJ considered that Plaintiff's pain was typically controlled with medication and Plaintiff was not on long-term rheumatoid arthritis medications. (Tr. 17 (citing Tr. 351); Tr. 18 (citing Tr. 646, 649–50, 698, 673)). Plaintiff's pain intensity, which she reported on multiple occasions as being a five or six out of ten, was considered. (Tr. 17 (citing Tr. 512–13); Tr. 18 (citing Tr. 699, 703)). The ALJ also noted that Plaintiff's pain level varied, sometimes reaching a severe pain level, and that Plaintiff reported experiencing more progressive chronic pain. (Tr. 18 (citing Tr. 563–64, 649–50, 673, 698–99, 703)). The ALJ even noted that Plaintiff

17

had identified the weather as a trigger for her pain crises. (Tr. 18 (citing Tr. 529)). The ALJ also considered the pain and swelling in Plaintiff's hands, knees, feet, and ankles (Tr. 17 (citing Tr. 520); Tr. 17–18 (citing Tr. 512); Tr. 18 (citing Tr. 649–50); Tr. 18–19 (citing Tr. 563–64)); Plaintiff's occasional rheumatoid deformities in her hands and feet (Tr. 19 (citing Tr. 514, 567, 648, 655, 674, 698, 701)), Plaintiff's occasional numbness and tingling (Tr. 17–18 (citing Tr. 512), Tr. 18 (citing Tr. 699, 703)), Plaintiff's occasional tender points (Tr. 19 (citing Tr. 514, 521, 602, 609, 650, 674, 698, 701, 908, 552; 648)), Plaintiff's occasionally limited range of motion (Tr. 19 (citing Tr. 514, 602, 609, 648, 650, 655, 674, 698, 701, 908)), and that she ambulated normally (Tr. 17 (citing Tr. 512–13)). Additionally, the ALJ considered the frequency and duration of Plaintiff's symptoms, noting that Plaintiff had been symptomatic since her late twenties (Tr. 17 (citing Tr. 512–13)), and that Plaintiff has had several flare-ups from 2017–2019 (Tr. 18 (citing Tr. 529, 646, 649–50), Tr. 19).

So, as the above shows, the ALJ thoroughly considered the record. The ALJ ultimately concluded that Plaintiff's allegations were not entirely consistent with the evidence. (Tr. 22). For instance, the ALJ emphasized that Plaintiff has "had [rheumatoid arthritis] for over twenty-five years and been able to work at a substantial gainful activity level despite having this impairment for much of that time." (*Id.*). The ALJ also noted that Plaintiff only recently started seeing a rheumatologist and has "not been on regular long-term treatment such as methotrexate." (*Id.*) "When [Plaintiff's] rheumatologist suggested certain long-term treatment, she decided to instead seek second opinions." (*Id.*) Instead, Plaintiff "just wanted short-term treatment." (Tr. 22 (citing Tr. 646)). Plaintiff's "conservative treatment . . . [does] not support her allegations of significant worsening symptoms." (Tr. 22). The ALJ concluded that "[i]f her symptoms had been as severe as alleged, she would be more receptive to try further additional treatment." (*Id.*).

"Discretion is vested in the ALJ to weigh all the evidence." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 668 (6th Cir. 2009). Here, the record supports the ALJ's finding that Plaintiff's "statements about the intensity, persistence, and limiting effects of . . . her symptoms," including pain, are not consistent with the record. At base, Plaintiff wishes "the ALJ had interpreted the evidence differently." *Glasgow v. Comm'r of Soc. Sec.*, No. 2:15-CV-1831, 2016 WL 2935666, at *7 (S.D. Ohio May 20, 2016), *report and recommendation adopted*, No. 2:15-CV-01831, 2016 WL 4486936 (S.D. Ohio Aug. 26, 2016), *aff'd*, 690 F. App'x 385 (6th Cir. 2017). But the law prohibits the Court from reweighing the evidence and substituting its judgment for that of the ALJ. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.")). The ALJ considered Plaintiff's symptom severity as set forth in Social Security Ruling 16-3p and concluded Plaintiff has the RFC to perform light work. The ALJ's ruling is supported by substantial evidence.

## IV. CONCLUSION

Based on the foregoing, it is **ORDERED** that Plaintiff's Statement of Errors be **OVERRULED** and that judgment be entered in favor of Defendant.

IT IS SO ORDERED.

Date: November 5, 2021                    /s/ Kimberly A. Jolson
                                                                                            KIMBERLY A. JOLSON
                                                                                            UNITED STATES MAGISTRATE JUDGE